Diana Arbelaez, Pro Se
1111 Brickell Avenue
Suite 1100
Miami, Florida 33131
305-913-7193

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JEFFREY A. THOMAS, Individually and On Behalf Of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>v.<br><br>DUN & BRADSTREET CREDIBILITY CORP.,<br><br>      Defendant. | Case No.: **2:15-cv-03194-BRO-GJS**<br><br>Judge: Hon. Beverly Reid O'Connell<br><br>**OBJECTION TO CLASS ACTION SETTLEMENT BY DIANA ARBELAEZ** |

      I object to the proposed settlement because it is unfair and it appears to be collusive.

      In the past five years, I have received <u>thousands</u> of non-emergency auto-dialer initiated phone calls from companies all over the United States trying to sell me products and services that I neither wanted nor needed. I run my own business, Lingua Franca Translations, which is a translation agency that I founded over six years ago. I use my cell phone (ending in 1819) not only as my primary business phone number for speaking with potential and existing clients but also as my primary tool for conducting business on a day-to-day basis. For years, I have been constantly interrupted and harassed by these computer-generated calls, even when I am abroad. I have missed work projects trying to avoid picking up the phone from unknown numbers. I have even paid roaming charges for auto-dialer initiated phone calls soliciting services when I was traveling in Europe. I have requested politely numerous times to cease the calls through automated calls to my cellphone by following the instructions of the computer calling system. I have requested to be removed from the calling lists numerous times. However, the companies that have these automated systems in place have only removed me from some lists but then placed me on others and the result has been that my requests have been ignored and my privacy and my business have been compromised.

      Last year, I sued a company called "Capital Advance Solutions" for violating the TCPA and obtained a judgment in excess of $17,000. See Case No.: 15-cv-23137 (S.D. Fla.). Unfortunately, I have been unable to collect the judgment and the phone calls from CAS (or somebody on their behalf) continue coming relentlessly.

The last organization on Earth that I expected to spam my cell phone was Dun & Bradstreet (which used to own, and now owns again, DBCC), which I thought was a pro-business company that was on the side of justice. In fact, Dun & Bradstreet's website says it is dedicated to "uncovering truth and meaning" from data. *See* *http://www.dnb.com/about-us.html*. The proposed settlement in this case appears to be more about <u>concealing</u> the truth from small business owners like me who received these repeated, intrusive robo-calls from DBCC.

The TCPA distinguishes between two types of monetary penalties: $500 for negligent violations or <u>**$1,500 for "knowing and/or willful" violations**</u>. See 47 U.S.C. §227(b)(3).

The proposed settlement in this case sidesteps the pivotal issue of whether Dun & Bradstreet acted "knowingly and/or willfully" in violating the TCPA.

Moreover, the settlement is not calculated based on a per call basis; instead, each potential class member only receives a single payment ***regardless of how many times they were called.*** See Settlement, ¶ 4.03. This seems unfair. What if some putative class members received 50 calls. Or 500 calls? Or 5,000 calls? In fact, there does not appear to be any statistical information provided about the average number of calls each putative class member received. Nor is there information about the exact time period that these calls were made. It seems unlikely that they occurred evenly, day after day, for five years. There must have been "campaigns" in the marketing sense.

Exactly how many robo-calls did DBCC place that violated the TCPA? Was it one call to each of the million class members? Two calls? 30 calls? How many *total* unauthorized computer generator calls were placed? How many calls is Dun & Bradstreet being released for in exchange for $10.5 million?

On a macro level, even at one call per class member the settlement amount is ridiculously low. There are 1,192,555 members of the putative class. *See* Plaintiff's Motion to Approve Settlement, DE 58 at page 22. Even assuming that each class members received only a single unauthorized robo-call, which is probably far from the truth, the total damages for this case would be based on the following formula: 1,192,555 times $1,500, which is a total potential damages award of $1,788,832,500.

So, on a macro level, this c settlement allows Dun & Bradstreet to pay $10.5 ***million*** to buy its way out of a $1.7 ***billion*** problem -- .006% of the total potential damages. And that is assuming only one call per class members.

This might be a $3.4 billion problem (if two calls were placed to each class member). Without any discovery, we will never know.

1   On a micro-level, $60 to $100 is equally unfair to each consumer.

2   Dun & Bradstreet owes me and each of the other class members **$1,500 *per violation***. The payment of $100 in total, regardless of the number of violations, is less than 1% of the total recoverable damages for each call received -- 0.067% of $1,500, to be exact. And when that is divided by two or three or four phone calls that each of the class members received, it is akin to Planck's Constant in terms of monetary nothingness.

   Accordingly, either on a "macro" or a "micro" level, the putative class members are receiving **significantly *less than 1% of total recoverable damages*** owed to each. That is not a mathematically fair settlement.

   I have no idea what the Plaintiff's lawyers have been doing since they filed this action on April 28, 2015, but it is obvious that they have done everything *except* take depositions to find out whether Dun & Bradstreet acted "knowingly and willfully."

   In fact, from what I can see on the docket, the plaintiff has taken **zero** meaningful discovery.

   Although the settlement agreement indicates that almost 9,000 pages of documents were produced, there is no description of what those documents contain and from my understanding of the litigation process it is extremely rare for a Defendant to produce the most important "smoking gun" documents -- such as incriminating emails about bounce-backs to re-assigned numbers and lists of defective consents -- without *multiple* motions to compel and for sanctions. I doubt very much that Dun & Bradstreet or Gibson, Dunn simply opened up their most secret files and gave up all "hot documents" -- including all incriminating emails and discussions among the marketing team -- after the first motion to compel that was "amicably" resolved through the rose-colored glasses of an anticipated $3.15 million pay day. If any of those 9,000 pages of documents were actually relevant or helpful to resolving this matter, we surely would have heard about them. But, predictably, none are referenced as having been important in any of the settlement documents and these first-round, "low hanging fruit" documents were unlikely to contain the Crown Jewels of discovery.

   The fact that that Class Representative's expert analyzed raw call volume data is also irrelevant -- that data does not indicate **who** at Dun & Bradstreet spammed millions of people with tens or hundreds of millions of computer generated calls -- or whether it was done with consent of the Officers and/or Board of Directors -- and it certainly does not answer the question of willfulness versus negligence, which should be the central issue for determining if the settlement amount is fair and reasonable.

3

Why is it so hard for the Class Representative to actually take a 30(B)(6) deposition of the defendant to find out how this happened and whether it was willful or negligent? From my understanding, a lawsuit is only comprised of three stages: pleadings, discovery, and trial. It is apparent that the lawyers here only know how to operate in the first stage (pleadings), and have no experience in either taking 30(b)(6) depositions or taking a matter to jury trial. Without being able to carry off the threat of actually deposing a witness or picking a jury, these Plaintiff's lawyers may have simply thrown in the towel out of total fear of litigating this case against Gibson Dunn.

To me, *the absence of a single deposition of the Defendant is irrefutable evidence of collusion*: Dun & Bradstreet is obviously hiding the truth. And its executives responsible do not wish to jeopardize their over-size bonuses by having to tell the truth under oath. So, they flash a $3.15 million legal fee in front of the Plaintiff's lawyers, which I guess was enough for them to cave in without a second thought for their clients, like me, who are supposed to be the people they are helping.

Bun & Bradstreet is afraid to have its deposition taken because it does not want consumers to find out the truth about what really happened when it made hundreds of millions of unauthorized and intrusive robo-calls to small business owners across the United States. This guerrilla marketing scheme, and the failure of the officers of DBCC to take personal responsibility, is also totally inconsistent with DBCC's "corporate culture," which supposedly included a "Failure Wall," in which employees, including Jeff Stibel, were supposed to **admit** their mistakes. *http://articles.latimes.com/2013/jan/27/local/la-me-beat-failure-wall-20130127*. Did this potential **$1.7 billion** problem make it to the Failure Wall? Did Plaintiff's lawyers even ask that question to anybody? No, because the Plaintiff's lawyers have not asked any questions whatsoever -- none at all -- of the perpetrators of this massive robo-call scheme. Whoever they may be.

This "settlement" exists in a total factual vacuum and benefits only the Class Representative's law firm.

There are no facts anywhere to be found about what led Dun & Bradstreet to engage in this massive TCPA violation. Isn't the court system supposed to be engaged in the search for truth? I want to know **what** happened and **why** it happened. I want to know if Dunn & Bradstreet just let the computer engineers loose on a list of potential cell phone numbers and started ringing **tens of millions of cell phones** across the country without regard for express written consent. If it was deliberate or reckless, then the settlement is not fair. Until lawyers actually start taking

1  depositions, we will never know who turned "on" the auto-dialer and whether they knew at the time that what they
2  were doing violated the TCPA and corresponding FCC rules.
3     And we certainly do not know -- although we are entitled to know -- if the person who authorized these
4  shenanigans received a **bonus** for the year 2014, or the year 2015, or the year 2016, or whether any of those bonuses
5  equal or exceed the $10.5 million paid to make this $1.7 **billion** problem go away.
6     Did anybody lose their job over this? Did anybody receive a notation in their personnel file?
7     Or rather, did somebody receive a promotion for this? Maybe the truth is that $10.5 million is nothing
8  compared to how much money DCBB made on subscription fees earned off their robo-call program. Did the Plaintiff's
9  expert make that calculation? No.
10    The former officers and directors of DCBB, and the current officers and directors of Dun & Bradstreet, are
11 hiding beyond a $10.5 million settlement that pays me .067% of my lowest possible damages **without any**
12 **consequence, repercussion, reprimand, censure, or punishment of single responsible human being.**
13 **Corporations do not act without human intervention. There is a person who was responsible for this disaster**
14 **and he or she appears to have totally skated without any consequence whatsoever.**
15    Maybe this was not a single person -- maybe the Director of Communications at DBCC authorized this?
16 Maybe the Board of Directors of DBCC did. If not, maybe a third-party aggregator is responsible who has not been
17 named as a party? Is that person or entity **STILL OUT THERE PLANNING ANOTHER AUTO-DIALER**
18 **MARKETING CAMPAIGN FOR ANOTHER FORTUNE 500 CLIENT**?
19    It serves no purpose for Dun & Bradstreet to promise not to violate the TCPA in the future if it was not the
20 party responsible. Without discovering the truth of what happened the Court system is merely condoning the
21 misconduct that resulted in tens or hundreds of millions of unauthorized robo-calls and is rewarding Dun & Bradstreet
22 with a five-year blanket release without ever getting to the root of the problem so it can be stopped.
23    It does not matter to me that other Fortune 500 companies paid $10 million to settle their TCPA cases. That
24 is totally irrelevant to whether THIS settlement is fair. How is a collusive settlement in another TCPA case where the
25 Plaintiffs' lawyers also failed to take a 30(b)(6) deposition and also failed to pick a jury at all a useful metric for
26 determining whether this settlement is fair?

5

   The arithmetic here is not very complicated. There are 1,192,555 putative class members who each received at least one robo-call in violation of the TCPA. Those people do not want a collusive $60 settlement. They want the truth about how and why a 200-year-old public company supposedly dedicated to helping American businesses succeed instead violated the trust of all their potential clients and destroyed the sanctity of their most important business tool, their cell phones, with illegal marketing activities.

   I also note for the record that the scope of the Settlement Class is suspiciously overbroad. Or it is further evidence of Dun & Bradstreet's "willfulness." The Settlement Class includes all people who received robo-calls from April 28, 2011 through January 31, 2016. This action was filed in April 2015. Is Dun & Bradstreet admitting not only that it placed illegal robo-calls for a 5-year period but also that it kept generating such calls for a year after it had already been sued? That makes no sense to me, and I would hope it isn't true. But then why is the Settlement Class so broadly worded? How many marketing campaigns was Dun & Bradstreet engaged in? And how many of those involved TCPA violations? Again, the failure of the Class Representative to take depositions and ask hard questions means that this settlement is virtually only capable of being understood by the people who created the problem in the first place, again, without any "justice" in the sense that, without understanding what happened, it is impossible for anybody to protect themselves from these incessant privacy intrusions in the future.

   The settlement is mathematically unfair and so lacking in "zealous" representation as to be collusive. The Court should order the Class Representative to take a 30(B)(6) deposition and report back to all of the class members about what really happened. Only then can the legal fairness, or lack thereof, be appropriately determined.

December 22nd 2016

                      /s/

Diana Arbelaez, Pro Se
1111 Brickell Avenue
Suite 1100
Miami, Florida 33131
305-913-7193

**CERTIFICATE OF SERVICE**

I served a copy of the foregoing on this 22nd day of December 2016 to the following

CLERK OF THE COURT
United States Courthouse,
312 North Spring Street,
Room G-8
Los Angeles, California 90012-4701
By US Mail

Daniel M Hutchinson, Esq.
Lieff Cabraser Heimann and Bernstein LLP
275 Battery Street 29th Floor
San Francisco, CA 94111-3339
Email: dhutchinson@lchb.com
By e-mail

Timothy William Loose
Gibson Dunn and Crutcher LLP
333 South Grand Avenue 54th Floor
Los Angeles, CA 90071-3197
Email: tloose@gibsondunn.com
By e-mail

7